UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>ARIA O. SABIT, )<br>)<br>Respondent. )<br>)<br>)<br>)<br>)<br>) | MISC NO. 2:14-mc-50155-GCS-RSW<br>Hon. George Caram Steeh<br>Mag. Judge R. Steven Whalen |

<u>**RESPONSE TO APPLICATION FOR SUMMARY ENFORCEMENT OF
CIVIL INVESTIGATIVE DEMAND 13-338,
PROOF OF SERVICE**</u>

**COUNTER-STATEMENT OF FACTS**

Dr. Aria O. Sabit, M.D. is a highly-trained, well-respected, hard-working neurosurgeon. The government's effort to tarnish his personal and professional reputation to the point that it is irreparable, in the context of a subpoena related to a civil investigation of a company that he once had a financial relationship with, is breathtaking. At the same time, Dr. Sabit is unable to refute the factual allegations while maintaining his rights under the Fifth Amendment, a fact that the government takes full advantage of throughout its recklessly inaccurate factual statement.

To take the most egregious example, the government asserts that "*there is evidence* that Dr. Sabit's surgeries using Reliance implants have resulted in significant complications and at least one death." Application, at 12 (emphasis added). It is hard to imagine a more damaging

1

public statement made about a doctor, especially when that statement comes from the United States Department of Justice – did the government's counsel really not appreciate the significance of what they were doing? They know how closely publicly-available documents about Dr. Sabit are being scrutinized (indeed, Dr. Sabit is firmly convinced that the government itself is the source of certain publicly-available information – just days after undersigned counsel asked the government's counsel to postpone Dr. Sabit's deposition because he was making a scheduled trip overseas, it was reported in the Wall Street Journal that he was a flight risk. http://online.wsj.com/news/articles/SB10001424127887323342404579081564042698766).[1]

Dr. Sabit therefore requests that, in order to comply with Rule 11, the government must now present that "evidence" to the Court or retract the defamatory statement and publicly apologize for it. It is one thing for the government to recklessly assert that there were improper economic connections between Dr. Sabit and Reliance (a charge that Dr. Sabit will fully disprove when/if the time comes) and quite another to recklessly assert that he killed a patient (an assertion that has absolutely no factual basis).[2]

The government also presents a chronology that it knows is false concerning Dr. Sabit's history in California. As the government presents it, Dr. Sabit's resignation was based on his

---

[1] In addition to commenting to the press, the government has aggressively "interviewed" the hospitals where Dr. Sabit works in a manner that has made them reluctant to maintain a professional relationship with him. And in investigating Reliance, the government has repeatedly overstepped its legal and ethical constraints, including a recent *ex parte* effort to interview a witness who had already, through counsel, invoked his Fifth Amendment rights.

[2] An attorney or party violates Federal Rule of Civil Procedure 11(b) by "presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it" — that the attorney knows is not well grounded in fact or warranted by "existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." "[T]he test for the imposition of Rule 11 sanctions is 'whether the individual's conduct was reasonable under the circumstances.'" *Tropf v. Fid. Nat'l Title Ins. Co.*, 289 F.3d 929, 939 (6th Cir. 2002).

suspension. But, as the government well knows, the California hospital reinstated Dr. Sabit shortly after it suspended him at the wrongful behest of Dr. Sabit's former partner. Finally, the government blatantly mischaracterizes Dr. Sabit's deposition testimony. He testified, quite truthfully, that he did not get paid by Reliance for the use of specific Reliance medical equipment. And he also has acknowledged his financial relationship with Reliance, although he was obviously unclear about the specific legal characterization of his ownership interest (a small but instructive example of the government's overblown hyperbole: the government asserts that Dr. Sabit has been denying his relationship with Reliance for "years" [see the Application, note 6] – even though the entire history of Dr. Sabit's testimony is less than a year).

Finally, the government even mischaracterizes the communication between counsel. First, Dr. Sabit never asked to be relieved of his obligations to respond to the subpoena. Second, the proposed response date of October 18, 2013 was based on the expectation that counsel would be able to discuss the scope of the subpoena beforehand, including protection of Dr. Sabit's Fifth Amendment rights. Unfortunately, due to the government shutdown in October, the parties could not meet until November 4, when undersigned counsel flew to Washington D.C. to meet with DOJ counsel.

Dr. Sabit then responded to the CID on November 18. The government let the case sit idly until late January, when Dr. Sabit was deposed. Then, on February 4, 2014, after waiting two months to follow up on the formal CID response, DOJ counsel called undersigned counsel to discuss the scope of the CID. On February 5, the government demanded Dr. Sabit's position "by the close of business today." Later that day, undersigned counsel emailed to explain that due to scheduling issues, the government could expect a response "early next week." Instead of waiting less than seven days, the government filed this application.

Dr. Sabit respectfully suggests that all of this background should make the Court skeptical of the government's arguments in this application, especially its argument that Dr. Sabit is not in the cross-hairs of a criminal investigation.

### 1. DR. SABIT PROPERLY INVOKED HIS FIFTH AMENDMENT RIGHTS

To start, although the government does not truly contest this issue, Dr. Sabit wants to make sure that the Court appreciates that he properly invoked his Fifth Amendment rights (the government concedes this in its footnote 1).

The Fifth Amendment to the U.S. Constitution provides that "[n]o person... shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. V. This privilege against self-incrimination "protects a person ... against being incriminated by his own compelled testimonial communications." *Fisher v. United States,* 425 U.S. 391, 409, 96 S.Ct. 1569, 1580, 48 L.Ed.2d 39 (1976). It "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972).

"The privilege afforded by the Fifth Amendment not only extends to answers that would themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *United States v. Grable,* 98 F.3d 251, 256 (6th Cir.1996), *cert. denied,* 519 U.S. 1059, 117 S.Ct. 691, 136 L.Ed.2d 614 (1997).

To trigger the protection of the Fifth Amendment, an individual must show only a "substantial and real hazard of self-incrimination." *United States v. Argomaniz,* 925 F.2d 1349, 1353 (11th Cir.1991) (quoting *Grosso v. United States,* 390 U.S. 62, 65, 88 S.Ct. 709, 19

L.Ed.2d 906 (1968)) (internal quotation marks omitted). Thus, "[a] witness may properly invoke the privilege when he `reasonably apprehends a risk of self-incrimination, ... though no criminal charges are pending against him... and even if the risk of prosecution is remote.'" *Id.* (quoting *In re Corrugated Container Anti-Trust Litig.,* 620 F.2d 1086, 1091 (5th Cir.1980), *cert. denied sub nom. Adams Extract Co. v. Franey,* 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981)) (internal quotation marks omitted).

Once the incriminating nature of the information sought is established, a court presumes the reasonableness of a claimed apprehension of prosecution unless genuine questions exist about the government's legal ability to prosecute. *United States v. Sharp,* 920 F.2d 1167, 1171 (4th Cir.1990) (citing U.S. Const. Art. II, § 3, for the proposition that such an assumption is compelled by the government's general constitutional obligation faithfully to execute its criminal laws, principally by prosecuting those whose commission of crime it has sufficient evidence to prove). "[C]ourts should not engage in raw speculation as to whether the government will actually prosecute." *Id.* (citing *United States v. Edgerton,* 734 F.2d 913, 921 (2d Cir.1984) (citation omitted)).

Here, there is a clear threat that the government will escalate its investigation from a civil to a criminal one. The government does not deny this; the rhetoric contained throughout the government's brief confirms this. The risk of criminal exposure is particularly high where, as here, the civil False Claims Act allegations being investigated under the government's Civil Investigative Demand (False Claims Act, 31 U.S.C. §§ 3729-3733) have criminal analogues with overlapping legal elements. And, although the government suggests that Dr. Sabit misunderstood the DOJ's comments, undersigned counsel recalls that, when asked, DOJ counsel did not deny that a criminal investigation was underway, and in fact offered the names of other

5

DOJ attorneys who were in the process of conducting it. Dr. Sabit thus met the burden for which the government cites the two supporting cases of *United States v. Baker*, 721 F.2d 647, 650 (8th Cir. 1983) and *Bear Stearns & Co., Inc. v. Wyler*, 182 F. Supp. 2d 679 (N.D. Ill. 2002).

## 2. DR. SABIT PROPERLY INVOKED THE "ACT OF PRODUCTION" PRIVILEGE UNDER THE FIFTH AMENDMENT

The next issue is whether Dr. Sabit properly invoked his Fifth Amendment rights regarding the requests for production of documents contained in the CID. The burden of proof is important – it is on the government, not on Dr. Sabit. The government's reliance on *Baker* and *Bear Stearns* on this level of inquiry is misplaced. The government "'bears the burdens of production and proof on the questions of ... possession[] and existence of the summoned documents.'" *In re Grand Jury Subpoena, Dated Apr. 18, 2003,* 383 F.3d 905, 910 (9th Cir.2004) (quoting *In re Grand Jury Proceedings, Subpoenas for Documents,* 41 F.3d 377, 380 (8th Cir. 1994)). This is a highly fact-intensive inquiry that looks at the "'quantum of information possessed by the government *before* it issued the relevant subpoena.'" *Id.* (quoting *United States v. Hubbell,* 167 F.3d 552, 569 (D.C.Cir.1999), *aff'd,* 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000)).

Dr. Sabit agrees with the basic principles outlined in the government's application, but not with how the government seeks to apply those principles to this case. In serving the CID, the government sought to use its considerable resources and power to compel Dr. Sabit to produce documents in clear violation of his Fifth Amendment rights. Yet the government simply did not follow the rubric set forth in the cases in drafting its overbroad subpoena – it is too late for the government to salvage the subpoena by "re-drafting it," literally on the eve of filing the present application.

6

The seminal case regarding the "act of production" privilege contained within the Fifth Amendment is the Supreme Court's decision in *United States v. Hubbell*, 530 U.S. 27, 36-37 (2000). Here is the Court's explanation of the privilege:

> We have also made it clear that the act of producing documents in response to a subpoena may have a compelled testimonial aspect. We have held that "the act of production" itself may implicitly communicate "statements of fact." By "producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." Moreover, as was true in this case, when the custodian of documents responds to a subpoena, he may be compelled to take the witness stand and answer questions designed to determine whether he has produced everything demanded by the subpoena. The answers to those questions, as well as the act of production itself, may certainly communicate information about the existence, custody, and authenticity of the documents. Whether the constitutional privilege protects the answers to such questions, or protects the act of production itself, is a question that is distinct from the question whether the unprotected contents of the documents themselves are incriminating.

The Court found that "the collection and production of the materials demanded was tantamount to answering a series of interrogatories" and "the functional equivalent of an answer to either a detailed written interrogatory or a series of oral questions at a discovery deposition." *Id.*, at 41-42. The Court continued:

> Entirely apart from the contents of the 13,120 pages of materials that respondent produced in this case, it is undeniable that providing a catalog of existing documents fitting within any of the 11 broadly worded subpoena categories could provide a prosecutor with a "lead to incriminating evidence," or "a link in the chain of evidence needed to prosecute."
>
> * * *
>
> In sum, we have no doubt that the constitutional privilege against self-incrimination protects the target of a grand jury investigation from being compelled to answer questions designed to elicit information about the existence of sources of potentially incriminating evidence. That constitutional privilege has the same application to the testimonial aspect of a response to a subpoena seeking discovery of those sources.

*Id.*, at 42-43.

Since *Hubbell*, courts have required the production of documents over the assertion of the Fifth Amendment privilege only where the government meets its burden of proving that it is requesting documents that have been described with "reasonable particularity." For a recent survey of the law, and a holding in favor of the Fifth Amendment, see *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012)(rejecting the subpoena because it required the responding party to "make use of the contents of his or her mind" in order to respond and because the government could not describe the requested documents with "reasonable particularity"); see also, *U.S. v. Ponds,* 454 F.3d 315 (D.C. Cir. 2006)("the government has failed to show with reasonable particularity that it had prior knowledge of the existence and location of many of the subpoenaed documents necessary to render their existence and location a 'foregone conclusion.'").

Now let's examine the government's specific requests. The starting point is the original CID, which is as broad as can be imagined. As in *In re Grand Jury Subpoena, Dated Apr. 18, 2003,* 383 F.3d 905, 911 (9th Cir. 2004), the breadth of the subpoena in this case "far exceeded the government's knowledge about the actual documents" that Dr. Sabit created or possessed. While the government may be able to identify specific documents, such as one email, the government "failed to draft the subpoena narrowly to identify the documents that it could establish with reasonable particularity." Thus, as in *Grand Jury Subpoena*, "on the record before us, the subpoena's breadth far exceeded the reasonably particular knowledge that the government actually possessed when it served the subpoena on" Dr. Sabit. As in that case, "[a] subpoena such as this, which seeks all documents within a category but fails to describe those documents with any specificity indicates that the government needs the act of production to build its case

8

against" Dr. Sabit. That is precisely the tactic prohibited by *Hubbell* and all the cases examining this issue.

The Court was also concerned about the "authentication" prong in light of the breadth of the subpoena. As the Court explained, "[i]ndependent verification not only requires the government to show that the documents sought to be compelled would be admissible independent of the witness' production of them, but also inquiries into whether the government is compelling the witness to use his discretion in selecting and assembling the responsive documents, and thereby tacitly providing identifying information that is necessary to the government's authentication of the subpoenaed documents. See also *In re Grand Jury Proceedings,* 41 F.3d at 381 (noting that "[c]ompliance with this broad language would require the witness to discriminate among documents, thereby providing identifying information that is relevant to the authenticity of the documents."); *United States v. Fox,* 721 F.2d 32, 39 (2d Cir.1983) (noting that the government needed an admission by the subpoena recipient that the subpoenaed documents were records matching the terms of the subpoena for authentication)." Again, the Court found the subpoena defective because it required the responding party to use "his knowledge and judgment to sift through, select, assemble, and produce the documents." The same is true here, as an analysis of each of the government's requests demonstrates.

### *Communications with Reliance*

The original request that may have encompassed communication between Dr. Sabit and Reliance was staggeringly broad: "Documents concerning Reliance, including without limitation…" See CID, Request No. 3. Request No. 2 was even worse: "Documents concerning any PODs [physician-owned distributorships] in which you have invested at any time, including

9

without limitation Reliance." These were fishing expeditions, pure and simple. The government had no idea about the existence or substance of these documents but was instead abusing its considerable power to force Dr. Sabit to help make the government's case by sorting through all his documents and matching certain ones up to the government's request, possibly implicating himself in the process. Because this is exactly the exercise deemed improper by *Hubbell* and its progeny, Dr. Sabit was certainly correct to assert his Fifth Amendment rights related to the original requests.

Dr. Sabit is equally correct to assert his Fifth Amendment rights related to the most recent iteration of that request. Of course, the most recent iteration is not the CID. The Court should deny the government's application, which seeks enforcement of the CID, on this ground alone. There is no provision that would allow the government, in as serious a matter as this, to revise its subpoena "on the fly" as it prepares to file a motion to enforce the badly-written CID.

In any event, even the recent iteration is not "reasonably particular." "Communications between Reliance and Dr. Sabit" (a subset of the original Request No. 3) is hardly a "reasonably particular" description. To the contrary, it is about as vague and general a description as the original, especially since the only document the government can specify is a single email from July 9, 2010. In answering this request, Dr. Sabit would be forced to go through all his emails and find those containing communication with Reliance, thereby locating and acknowledging the existence of emails that the government apparently knows nothing about. In addition, "Reliance" is a corporate entity, so Dr. Sabit would also have to sort out the relationships between various individuals and "Reliance." The government provides no support for the assertion that it "independently knows" that such documents exist, other than the one email.

Thus, *Hubbell* and its progeny prevent the government from compelling Dr. Sabit to engage in this exercise.

The Court cannot possibly enforce the subpoena (either as drafted or as revised) and at the same time preserve Dr. Sabit's Fifth Amendment rights.

### Medical Records

As for medical records, once again, the Court should appreciate the breadth of the original request, with its near limitless scope: "Medical records and all other documents pertaining to all patients that you have treated at any time using Reliance products." See CID, Request No. 4. To answer this question, Dr. Sabit would first have to determine which of his patients were treated with Reliance products. This alone is a testimonial act. Next, he would have to find all documents that "pertain" to those patients, even if those documents were produced long before or long after Dr. Sabit may have implanted a Reliance product. And given the "Instructions" contained in the CID, if he at one time had a patient file but no longer does, he would have to also produce documents reflecting the transfer of those files, as well as documents containing "references to" such documents.

Other than basic medical records kept in the ordinary course of business by the hospitals, there is no evidence that such documents exist. Without at all conceding the existence of such a document, suppose Dr. Sabit had noted that he received a kickback each time he used a Reliance product. Suppose he created a chart of surgeries performed using Reliance products over time, correlating it to communications with Reliance officers. The government, without any knowledge of such documents, impermissibly seeks to use the CID to discover them.

As for basic medical records, the government's best source for those records is the hospitals themselves. As the government explains, it may have the right to inspect those

documents because of the hospital's request for payment under Medicare. To the extent Dr. Sabit has any records, his selection of files to personally maintain implicates the Fifth Amendment when the request is very broadly for "medical records." There is no doubt that the government is asking Dr. Sabit to make a selection -- the government requests only those records for patients "on whom Reliance devices have been used," which forces him to review all of his records for all patients no matter what devices were used and then produce only certain of those files. Perhaps, if the government has a list of records by patient name, it should have drafted the CID with that list and then requested all records concerning those patients kept in the regular scope of Dr. Sabit's practice. It is too late now, however.

### *Communication with the Medical Board of California*

As for documents related to the Medical Board of California, the government does not tell the Court that Dr. Sabit already offered to provide those documents as long as production was not deemed to be a waiver of his Fifth Amendment rights. He made that offer on November 18, 2013 in the formal response to the CID. The government never responded. Nor does the government explain why it is burdening Dr. Sabit, knowing he has constitutional rights to protect, instead of collecting documents from a third party. Finally, once again, the recent iteration of the request is not the same as the overbroad one in the CID: "Documents reflecting any communication with any state or other licensing authority concerning your practice of medicine." This request would require Dr. Sabit to, among other things, search his files for completely irrelevant information, such as his application for licensing or the payment of dues.

### CONCLUSION

The Fifth Amendment, as interpreted by the Supreme Court, protects individuals against exactly the kind of overbroad investigation that the government is conducting here. Therefore,

Dr. Sabit asks the Court to protect his Fifth Amendment rights and to deny the government's request to enforce its recklessly-drafted CID. The government should have been considerably more careful before using its investigative powers, as it should be in all respects as it relates to Dr. Sabit.

                            Respectfully submitted,

                            **JONATHAN B. FRANK, P.C.**

By: _____/s/_____
                            Jonathan B. Frank (P42656)
                            Attorney for Dr. Aria O. Sabit, M.D.

Dated: February 25, 2014



### PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all parties in the above cause by serving same through the ECF system on the 25th day of February, 2014.

                            _____/s/_____
                            Amy Zielinski

J:\8246\6\00190132.DOCX